**UNITED STATES of America**

v.

**Frank Paul VENTIMIGLIA, James Harold Parran, and Weather-Mastic, Inc., a Maryland corporation.**

**Cr. No. 23345.**

United States District Court
D. Maryland.
Sept. 28, 1956.

**38**

Walter E. Black, Jr., U. S. Atty., and William F. Mosner, Asst. U. S. Atty., for United States.

Ellis Levin, Calman A. Levin and Albert H. Blum, Baltimore, Md., for defendants Ventimiglia and Parran.

Robert F. Skutch, Jr., Baltimore, Md., for Weather-Mastic, Inc.

**R. DORSEY WATKINS, District Judge.**

The defendants were indicted on a four-count indictment for violation of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., specifically, 29 U.S.C.A. § 186(a); and also under 18 U.S.C. § 371 (conspiracy to commit an offense against the United States). Count I was for conspiracy to violate section 186(a)[1]. The overt acts alleged were the payment by the defendants Parran and Weather-Mastic, Inc., through the defendant Ventimiglia, of sums of money to one Joseph Martin, "the representative of Weather-Mastic, Inc.'s employees", on August 13, 1954, October 14, 1954, February 18, 1955 and June 4, 1955. The 2nd, 3rd, 4th and 5th counts were for the substantive offenses of making the payments in question.

Motions to dismiss the indictment were made on behalf of all the defendants, primarily upon the ground that Martin was not at any of the times in question a "representative" of Weather-Mastic's employees.[2] For the purpose solely of securing a ruling upon the motions to dismiss, a stipulation of facts was filed. After extensive oral arguments and the submission of briefs, the motions to dismiss the indictment were overruled.[3] The facts embodied in the stipulation then seemed and still seem to me sufficient to constitute Martin a "representative" of the corporate defendant's employees within the meaning of 29 U.S.C. A. § 186(a), and that it was not necessary that he be a "collective bargaining representative".[4] I considered this to be the reasonable conclusion to be drawn from the holdings in United States v. Ryan, D.C.S.D.N.Y.1955, 128 F.Supp.

---

1. 29 U.S.C.A. § 186(a) reads as follows:
   "(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."

2. An additional ground of the motions was that the words "any representative of any

of his employees" were so vague and indefinite as to be repugnant to the due process clause of the Fifth Amendment to the Constitution of the United States. I consider this contention to be totally without merit.

3. No opinion for publication.

4. A fortiori would this be true in the case of non-union labor, where no established

128, United States v. Brennan, D.C.Minn. 1955, 134 F.Supp. 42, and the dissenting opinion of Judge Learned Hand in United States v. Ryan, 2 Cir., 1955, 225 F.2d 417, all of which I considered to be far more persuasive than the Second Circuit majority opinion. The subsequent reversal by the Supreme Court, in United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. ——, of the Second Circuit majority certainly has done nothing to weaken this conclusion.

The case then proceeded to trial on the merits.

During all the times in question, Weather-Mastic, Inc. was a corporation engaged in the insulating and weatherproofing business; the defendant Parran was general manager of its operations; and the defendant Ventimiglia was its labor relations counsellor and adviser.

Weather-Mastic operates a non-union shop. This presents no problem on small jobs for private individuals, but poses a serious problem where Weather-Mastic seeks work as a subcontractor under a prime contractor who operates on a union basis. In 1949 on a union job in Washington on which Stone & Webster Corporation was general contractor, Weather-Mastic had encountered difficulties because its employees did not have union cards. It had been forced to make a settlement with a representative of one of the unions working on the project. At or about the same time, Weather-Mastic's employees had been denied access to a union job at the Bethlehem Steel plant in Maryland until they had been supplied with union cards, furnished by Ventimiglia who, at that time and until about June 10, 1954, was business representative of United Slate, Tile and Composition Roofers, Damp & Waterproof Workers' Association, Local No. 80, affiliated with the American Federation of Labor (now A. F. of L–CIO). Shortly after straightening out the Bethlehem Steel matter for Weather-Mastic, Ventimiglia became "labor adviser" for Weather-Mastic, receiving his first pay on October 25, 1949, and remaining on Weather-Mastic's payroll during all the times in question.

Weather-Mastic submitted a bid for work at Alexandria, Virginia, on which Stone & Webster was general contractor. Stone & Webster's then superintendent of construction testified that he was under the impression that Weather-Mastic was a union firm and that Weather-Mastic would not have been accepted as subcontractor had Stone & Webster known that Weather-Mastic was non-union.[5]

Martin's job as business agent for Local No. 80 was to negotiate wage agreements,[6] working conditions, adjust grievances, arbitrate, endeavor to maintain harmonious relationships with employers and other unions, represent members of his union in any controversies, place his members on jobs, and endeavor to negotiate agreements with as many employers as possible.

One of the important duties and functions of a union business agent[7] is to

pattern of representation has been developed; and where presumably such employees could have a representative, or representatives, formally or informally sanctioned, in as many or as few fields of labor relations as they desired.

5. Throughout the trial, the contention was made by defendants that Weather-Mastic was the sole local franchise holder for the distribution and installation of a patented insulation. Apparently, the sub-contract called for the use of this particular insulation. The Stone & Webster construction superintendent testified that rather than let a contract to a non-union employer, the specifications would have been changed, if necessary, so as to use different insulating material.

6. A standard agreement with respect to wages and general working conditions is negotiated annually or biennially, with as many employers engaged in the building trades as Local No. 80 and some 21 other locals are able to negotiate. The terms so negotiated are applied to all work within the contract period whether performed for the contracting employers, or for employers who are not parties to the contract. There is accordingly no occasion for individual negotiation with any employer as to rates of pay and other working conditions within the contract periods.

7. "Business agent", "business representative" and "business manager" were used

check not merely those who work on a job in a field covered by his particular union, but also to determine, on a union job, if those not members of his union have proper union credentials. Evidence of union authority to work is supposed to be carried on the person of each member at all times while at work, and to be displayed on request to any representative of his own or any other union involved on the job. Ordinarily, if a card appears to be in order, no further questions are asked. If, however, a representative is not satisfied with the card, he will check further with the business representative of the union issuing, or purportedly issuing, the questioned card. Almost invariably an assurance of regularity given by a business representative in response to such an inquiry will be accepted by the inquirer as conclusive.[8] It was therefore an important function of Martin, as Business Agent of Local No. 80, just as it had been of Ventimiglia when he previously had been Business Agent of Local No. 80, to vouch for those holding cards of that union; and satisfactorily to answer any inquiries as to the status of such holders, so that there should be no interruption to their work or employments.

The cards, or evidences of good standing and right to work, were of various kinds and origins. The holder might be a member in good standing whose dues were fully paid up; or he might be a member from whom some instalments were still due. Where union members were permitted to work outside the territorial jurisdiction of their own local, their status was cleared through, and they were supposed to report to, the business agent of the local in whose territorial jurisdiction they were to work.[9]

In other cases, under certain circumstances, a "working card" might be held.

These bore the name of the Local (here "Roofer's Union, Local No. 80—A.F. of L."); the legend "Working Card"; a card number; the name of the person to whom issued; the name of the "Shop" [employer]; the date of issuance; and the signature of the issuing Union's "Business Manager". Such cards could be issued, at least for a 30-day period, to non-union men when the union had been unable to supply a full complement for any job. According to the undisputed testimony, working cards were considered by union officials, and presumably by union members, as evidence that the holder has been cleared through the Union and is under its "jurisdiction".

Martin in checking on employment at various jobs, had found that Weather-Mastic employees were using working cards which had been signed by Ventimiglia as business agent of Local No. 80, specifically on jobs at Sparrows Point and Western Maryland Dairy. He, on or about July 30, 1954, got in touch with Weather-Mastic, and arranged for an appointment to discuss this practice. Three or four days later, pursuant to an appointment, he went to Weather-Mastic's office [10] where a conference was held, attended by (Joseph) Martin, (James H.) Parran, Ed(win) Harlan, attorney for Weather-Mastic and for Ventimiglia, Frank (P.) Ventimiglia and Callahan, the field superintendent of Weather-Mastic. Martin explained that he did not "appreciate" the use of work cards by Weather-Mastic employees on union jobs when Weather-Mastic was not a union employer. Ventimiglia replied that Martin well knew that Weather-Mastic could not afford to pay union wages. Martin requested Weather-Mastic to sign a union contract and to get rid of Ventimiglia. Harlan, in the presence of the others above named, said that Martin would

interchangeably in the testimony as synonymous.

8. It is unnecessary to determine exactly what the consequences of lack of a union card, or of a satisfactory one, would be, other than to say that the testimony was clear that the results would be undesirable from the viewpoint of ability to work.

9. Local No. 80 had the right to supply 50% of employees on jobs in Alexandria, or more if the Washington local was unable to supply the remaining one-half.

10. This was the first, and only, time that Martin went to defendant's office.

have to work with Ventimiglia and do what Ventimiglia said. Martin replied that he could not go along with this; basically, because Weather-Mastic had no right to work on union jobs with the cards issued by Ventimiglia. Harlan then said that Martin should "work with Frankie" (Ventimiglia) and that he would be paid by Frankie for issuing working cards, just as Ventimiglia had been paid by the company in the past; but that Ventimiglia was to pay Martin out of payments made by Weather-Mastic to Ventimiglia.

After the conference, Martin talked to his attorney and then contacted the F.B.I. and advised that Bureau of the conference and of what had transpired.

A few days later, in response to a telephone call, Martin met Ventimiglia who advised him that he was being paid $250 per month, and in the past had issued working cards with the understanding that if any big jobs were obtained and Weather-Mastic made a substantial profit, he would receive additional money. Martin was told that if he would issue cards he would be paid $100 per month by Ventimiglia. Martin disclosed this and all other conversations and meetings to the F.B.I. On August 12, 1954, Ventimiglia telephoned Martin and arranged for another conference.[11] At the meeting Ventimiglia discussed the necessity for working cards since Weather-Mastic had several union jobs in view, and asked Martin to issue cards just as Ventimiglia had done "for years". Specific potential jobs were mentioned, including one under Stone & Webster at Alexandria, Virginia. Ventimiglia paid Martin $100 and promised him $100 a month. On October 14, 1954, in response to Ventimiglia's request, Martin brought a book of working cards. Ventimiglia gave him a list which he said was of employees of Weather-Mastic, whose names had been obtained from Weather-Mastic. Martin filled out the cards and gave them to Ventimiglia who said that they would be turned over to Weather-Mastic, to be given to the men for use on union jobs; and that Martin was to give them the same protection that Ventimiglia had afforded.

Ventimiglia did not make the monthly payments regularly, and on several occasions Parran talked with Martin and when he found out that Ventimiglia had not been paying, he said that if Ventimiglia did not, Parran would get him off the payroll.

On February 14, 1955, Parran talked with Martin and asked him to come to Parran's office as Weather-Mastic was going to start a $30,000 contract at Alexandria, Virginia, under a prime contract which was 100% union. Parran advised Martin of the previous trouble in Alexandria with the painters' union and stated that in addition to the payment to that union's business representative in Alexandria, Ventimiglia had issued working cards to Weather-Mastic employees to permit them to work. Martin refused to go to Weather-Mastic's office.

On February 16, 1955, Parran told Martin that he was going to use, on the Stone & Webster Alexandria job, the men for whom Martin had issued working cards. He gave the names of three of the employees who were going to work on the job under Callahan. Parran advised Martin he had received a report that some other union representatives were going to "integregate"[12] Weather-Mastic's employees. Parran wanted Martin to go over to the job and check for himself and see that the men had proper working cards.

11. Before attending the conference, Martin was searched by the F.B.I., which emptied his clothes of all contents. He then went alone to meet Ventimiglia at the appointed place without any money and with only some working cards in his possession. He was kept under observation by members of the F.B.I., and after the conference, turned over to them the amount received. This procedure was followed with respect to every meeting at which cards were issued and money was passed. It was stipulated that Martin received a total of $700 from Ventimiglia at the rate of $100 per meeting. Only four payments, however, are covered by Counts II–V of the indictment.

12. Undoubtedly "interrogate" was meant.

On February 18, 1955, Parran telephoned Martin and when he could not reach him at his office, had him paged at the barber shop he patronized. Parran told Martin that Ventimiglia was to receive some money;[13] that Parran needed a working card for a fourth employee and that Ventimiglia would pick it up. The card was made out and delivered to Ventimiglia who said that the Stone & Webster job was to start the following Monday morning and that it was a 100% union job.

On February 23, 1955, Martin went to the job in Alexandria, Virginia; was admitted by the guard after signing his name and receiving a badge; and talked to Callahan, and then to the Weather-Mastic employees who showed Martin their cards which were the same ones Martin had made out and delivered to Ventimiglia. Martin wrote down the names and numbers and then handed the cards back, telling the men that it was "O.K. to work on the job." At that time Martin gave each employee his business card. He then gave the F.B.I. the names and card numbers he had written down. That evening the employees in question were interrogated by the F.B.I. and their cards impounded. Upon advice to Stone & Webster that the working cards were being held by the F.B.I., Weather-Mastic employees were permitted to continue at work.

On June 3, 1955, Martin called Parran because Ventimiglia had been "putting him off".[14] The next day Martin met Ventimiglia who asked for working cards. Martin signed his name as business agent of Local No. 80 to seven cards and asked Ventimiglia what names should be filled in. Ventimiglia telephoned Parran and then told Martin that he would have one of the Weather-Mastic employees in the office type the appropriate names on the cards. Another payment of $100 was received by Martin from Ventimiglia at that time.

Callahan, who was field superintendent for Weather-Mastic from September 1953 to May 1955 and was on the Stone & Webster job in February 1955, testified that he had given Weather-Mastic employees working cards on three jobs; that these gave "permission to work on a union job." When the cards were given to the employees, they were told that these gave them the right to operate on union-controlled jobs; they were to put them in their wallets and hold them if needed; and if they were questioned, they were to refer the inquirer to Callahan. He said that Parran had instructed him to give the men cards when on union jobs, which would permit the men to work on such jobs. Parran further told him that it was the policy of Weather-Mastic not to involve the men in these matters, so that if any questions were asked of them, they were to go to Callahan and he would refer the matter to the Weather-Mastic's "business representative" Ventimiglia who was "connected with the union"; and later when Martin became business agent of Local No. 80, Callahan was told to refer any inquiries to him.

Callahan did not know of any instance in which the employees were asked to, or did, exhibit working cards. Each of the three employees who testified and who had received cards signed by Martin as business agent for Local No. 80, denied any acquaintance with Martin, and each testified that he had not asked Martin to represent him or to do anything for him with respect to such employee's employment.

At the end of the Government's case, motions were filed on behalf of each de-

13. Parran also told Martin that he had wanted to put Martin on the Weather-Mastic payroll "direct", but that "legal counsel" had advised him "No, because, due to the recent investigations of Congress about the contractor that was just guilty, and a representative of labor, of the case that was pending before a congressional committee over there * * *."

14. On May 26, 1955, Ventimiglia told Martin that Ventimiglia had been in close contact with Parran "and that they were going to start paying off again"; and that Ventimiglia would take care of Martin as he had done before.

fendant for a judgment of acquittal. Ruling on these motions was reserved and the defendants declined to offer any evidence. Subsequently, the motions were argued and decision held sub curia pending the filing of briefs. Counsel for defendants again urged as a ground for acquittal that the evidence failed to show that Martin was a representative of the corporate defendant's employees within the meaning of 29 U.S.C.A. § 186(a).

On September 6, 1956, I filed an informal memorandum adhering to my ruling, on the motions to dismiss, that to come within the provisions of Section 186(a) it was not necessary that the "representative" be a formal "collective bargaining representative." However, the testimony did not show a situation similar to that submitted by the stipulation. The testimony affirmatively established that the corporate defendant's employees were not at any time members of Local No. 80 of which Martin was the business agent, and also affirmatively established that none of these employees, prior to February 23, 1955, knew that Martin was or was purporting to "represent" them. Accordingly, in the absence of representation by operation of law (which is not applicable here) or prior authorization by the employees or subsequent ratification by them, as to neither of which was there any evidence, I granted the motions for judgment of acquittal as to each of the defendants on Counts II, III, IV and V of the indictment. In so doing I of course did not and do not condone or approve the conduct of the defendants or any of them, but simply decided that as to those counts the evidence did not establish a violation of the specific statutory provisions under which the prosecution was brought.

I suggested to counsel, however, that the conspiracy aspect presented a different problem and that as this had not been briefed or argued, a decision on Count I would be deferred until briefs had been filed and the point had been argued orally, which has now been done.

Defendants contend that the evidence fails to show beyond a reasonable doubt that defendants intended Martin to do acts which a "representative of employees could properly do and would be expected to do", or that defendants intended to deal with Martin as a representative of Weather-Mastic's employees. However, their argument in substance simply boils down to the contention that because the defendants desired Martin not to represent Weather-Mastic employees in *all* respects, they did not intend to deal with him as a representative in *any* respect. In my opinion, the evidence establishes beyond a reasonable doubt that in all aspects of employee representation which related to evidencing, and supporting if questioned, the union status of Weather-Mastic's employees, and their qualification to work on 100% union jobs, the defendants dealt with Martin as a representative. Under the conditions in the craft represented by Local No. 80, even if Martin had unionized Weather-Mastic's employees, and had been formally elected their bargaining agent, there would have been no negotiations with Weather-Mastic as to wages or working conditions until the time came for the negotiation of a new master contract. But had Martin, or anyone else, negotiated with Weather-Mastic and obtained an unusually fine labor contract, no practical benefit could have flowed to the employees, unless they were able to work. What Martin was to do and did was in that most important phase. He, as Ventimiglia before him, was to furnish the necessary indicia of union membership, and if questions arose, handle the matter so that there would be no interruption to work. From bitter experience defendants knew the need for such representation.

I find that the defendants intended Martin to represent, and paid him money for such intended representation of, Weather-Mastic's employees. True, they did not want him fully to represent Weather-Mastic's employees in all respects. He was told not to approach them (except to verify their cards); he was not to organize them, or to negotiate on their behalf with the employer as to

wages. But there can be no doubt that the defendants intended Martin to do acts which a representative of employees would be expected to do—insure the availability and continuity of work. Likewise, Martin could have become the formal representative of the employees had they initiated the issuance of cards, or accepted or used them knowing the reasons for which, and the circumstances under which, the cards were issued.

Martin performed all that was necessary apparently to qualify the men to work. He issued the working cards, and was prepared to vouch for the men if necessary. He, as Ventimiglia before him, was to do and did what was necessary to permit the men to work on union jobs. To say that because it did not become necessary for Martin to do all that a representative might do, in his limited field, the defendants did not intend him, in that limited field, to represent the employees, would be to say that a bank guard is not a bank guard if the bank is never robbed. Payments to Martin were in the nature of work and job insurance premiums; the fact that the casualty insured against never occurred, does not in any way alter the purpose and reason for which he was paid.

That Martin failed in fact to qualify as a representative under Section 186(a), because the employees neither authorized nor ratified his representation, does not alter the fact that defendants paid him to represent the employees. At any time, an employee might have been questioned, and with the employee's knowledge and with his consent, Martin might have performed the functions of, and in fact have been, a formal representative. Further indication that defendants thought of him as a representative, and paid him as such, is the fact that additional working cards were obtained from him and a payment made to him on June 4, 1955, more than three months after the F.B.I. had interviewed employees in connection with the Alexandria job, and had taken their cards, and after the employees had received his business cards from Martin. Certainly, defendants intended to deliver these working cards to, and have them used by, Weather-Mastic's employees; equally certainly, they must have known that their employees then knew what Martin had done; and the acceptance of cards by the employees thereafter would in fact have been an acceptance of Martin by the employees as their representative. They therefore intended Martin to represent their employees, and intentionally dealt with him as such.

I therefore find that at least since February 23, 1955, defendants intended to deal with, and dealt with, Martin as a representative of their employees. The defendants cannot avoid the natural consequences of their conduct by a simple denial that Martin was such a representative when the evidence is that they intended him to be and dealt with him in that capacity; nor does the fact that they did not want him to be (and indeed forbade him to be) the employees' representative in certain respects, prevent him from being such representative in the limited field in which he was to, and did, act.

■ As to the law, defendants admit that a conspiracy may exist where the overt acts performed in its execution fall short of the accomplishment of its purpose; and that conceivably, a conspiracy may exist, although it finally develops that the object thereof could not be accomplished at all. Defendants nevertheless seek to take this case out of these principles on the ground that for liability to exist "the conspirators" must have "intended that their agreements and overt acts would result in the accomplishment of some illegal act." They then revert to the contention that defendants did not intend Martin to be a representative (which has been disposed of above) and concentrate upon cases holding that it is not unlawful to conspire to do an act which is lawful. France v. United States, 1897, 164 U.S. 676, 17 S.Ct. 219, 41 L.Ed. 595, and United States v. Halseth, 1952, 342 U.S. 277, 72 S.Ct. 275, 96 L.Ed. 308, holding that under a statute dealing only with an "existing" lottery there is no violation of law in the

transportation of gambling materials when no lottery existed, are clearly not in point. These cases do not hold, or even suggest, that a conspiracy to transport lottery or gambling materials would not be actionable. Likewise, holdings that it was not criminal to conspire to induce bona fide entrymen, after perfecting their applications, to sell to defendants, when the law forbade only a bad faith initial application, are inapposite. United States v. Biggs,[15] 1909, 211 U.S. 507, 29 S.Ct. 181, 53 L.Ed. 305; Fain v. United States, 8 Cir., 1913, 209 F. 525.

But defendants did not conspire to do an act which, if consummated as they intended, would have been lawful. What they intended to do was to make payments to a representative of their employees. The fact that they failed, because, for the reasons above recited, Martin was not such a representative under Section 186(a), frees them from liability under the counts for substantive offenses. It does not mean that defendants agreed to do a legal act. Under the facts, defendants conspired to do an act which, if consummated as intended, would have been unlawful.

For liability, it is sufficient if the end for which the defendants conspired and toward the consummation of which an overt act was done, would have been unlawful if consummated as defendants planned. Specifically, they planned to make payment to a representative of Weather-Mastic's employees. They made payments to a person they intended and believed to be such representative. The circumstance that, through no fault of theirs, such person was not in fact a representative of such employees, does not relieve them from liability. In addition to the obvious tendency of such acts to thwart the purpose of Section 186(a), the decisions in analogous cases are persuasive. In United States v. Hood, 1952, 343 U.S. 148, 72 S.Ct. 568, 569, 96 L.Ed. 846, defendants were charged with violation of 18 U.S.C. § 215 making it a misdemeanor to solicit or receive any money

or thing of value, in consideration of the promise of support or use of influence in obtaining for any person " 'any appointive office or place under the United States' ". In the trial court, they successfully urged that the bribes they had accepted related to offices authorized but not yet officially created, and that the statute covered only actually created, and not non-existent, although potential, offices. In reversing, the Supreme Court said, 343 U.S. at page 150, 72 S.Ct. at page 569:

"We think the District Court was wrong. The statute is plainly broad enough on its face to cover the sale of influence in connection with an office which had been authorized by law and which, at the time of the sale, might reasonably be expected to be established. That was the situation here and we do not have to go further to say whether the words will cover the sale of an office which is purely the creature of the seller's fancy.

"The evil at which the statute is directed is the operation of purchased, and thus improper, influence in determining the occupants of federal office. But in attacking that evil, Congress outlawed not the use of such influence, but the solicitation of its purchase, the peddling of the forbidden wares. As is not uncommon in criminal legislation, Congress, in order to strike at the root, made the scope of the statute wider than the immediate evil. * * *"

In United States v. Perlstein, 3 Cir., 1942, 126 F.2d 789, certiorari denied 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752, the charges were conspiracy to obstruct justice, and actual obstruction. The defendants were held not answerable on the substantive count, as their conduct had related to the influencing of witnesses or potential witnesses before United States Commissioners and the Federal Grand Jury, and the substantive offense was held to relate only to proceedings

15. Citing as authority Williamson v. United States, 1908, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278, infra.

pending in the courts. On appeal, conviction on the conspiracy count was upheld, the court saying, 126 F.2d at page 795:

"A somewhat analogous situation was presented in the case of Williamson v. United States, 207 U.S. 425, 446, 447, 28 S.Ct. 163, 170, 52 L.Ed. 278. In the Williamson case R.S. Section 5440 was directly under consideration. The appellant contended that there was no federal statute which prescribed a punishment for the mere attempt of an individual to procure the commission of perjury. In respect to this contention, Mr. Justice White stated, 'But the proposition wholly fails to give effect to the provisions of the conspiracy statute (U.S.Rev.Stat. § 5440 * * *), which clearly renders it criminal for two or more persons to conspire to commit any offense against the United States, provided only that one or more of the parties to the conspiracy do an act towards effecting the object of the conspiracy. In other words, although it be conceded, merely for the sake of argument, that an attempt by one person to suborn another to commit perjury may not be punishable under the criminal laws of the United States, it does not follow that a conspiracy by two or more persons to procure the commission of perjury, which embraces an unsuccessful attempt, is not a crime punishable as above stated. The conspiracy is the offense which the statute defines, without reference to whether the crime which the conspirators have conspired to commit is consummated.' See, also, Becher v. United States, 2 Cir., 5 F.2d 45, certiorari denied 267 U.S. 602, 45 S.Ct. 462, 69 L.Ed. 808."

The reliance upon and quotation from Williamson v. United States, 1908, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278, is particularly significant, as Williamson had been the basis of decision in United States v. Biggs, supra, relied upon by defendants.

In United States v. Bryant, D.C.Tex. 1917, 245 F. 682, the conspiracy was one forcibly to resist the raising of an army by conscription. At the time of the conspiracy and of defendants' arrest, the draft act had not been passed, so that the final objective could not have been attained. The court said, 245 F. at page 684:

"This act, at the enforcement of which the alleged conspiracy was leveled, was, as a matter of fact, later passed by Congress. If the prompt steps taken by the officers of the government, in causing the arrest and prosecution of the alleged conspirators, thwarted the conspiracy and prevented armed resistance and rebellion, such of the defendants who may be proved to have been parties to such conspiracy are none the less guilty, nor does the fact that the whole scheme was chimerical and utterly impossible of success, make it any the less a conspiracy denounced by the statutes of the United States." [16]

See also United States v. Schanerman, 3 Cir., 1945, 150 F.2d 941, holding that where a member of a draft board had been bribed, it was no defense that the board of which the bribee was a member had no jurisdiction over defendant; and American Tobacco Co. v. United States, 1946, 328 U.S. 781, at page 789, 66 S.Ct. 1125, at page 1129, 90 L.Ed. 1575, where the court said:

"Petitioners, for example, might have been convicted here of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy * * * *."

---

16. The reasoning in Hood and Bryant is far more persuasive to me than the alternative holding in Woo Wai v. United States, 9 Cir., 1915, 223 F. 412, cited by defendants, under which anticipation of, and prevention by federal officers of, the consummation of a crime was held to negative a conspiracy by defendants to commit the crime.

In this case, defendants conspired to make payments to a representative of Weather-Mastic's employees and pursuant thereto made payments, even although they may not have "acquired the power to carry out the object of the conspiracy."

Reasonably analogous are the attempt cases, a conspiracy being an agreement by two [17] or more persons to (attempt to) do an illegal act, coupled with an overt act. Under the common law, a person could be guilty of an attempt to commit a crime, even although in fact it was impossible to commit the crime attempted. People v. Jones, 1881, 46 Mich. 441, 9 N.W. 486—pickpocket guilty of attempted theft although the pocket entered was empty; Reg. v. Goodhall, 1846, 2 Cox.Cr. Cas. 41, 1 Denison Cr.Cas. 187—conviction for attempted abortion on nonpregnant woman; Clark v. State, 1888, 86 Tenn. 511, 8 S.W. 145—conviction of attempted larceny in rifling an empty cash register; People v. Gardner, 1894, 144 N.Y. 119, 38 N.E. 1003, 28 L.R.A. 699—conviction for attempted extortion, although intended victim, because of resort to police and reliance on their directions, was not in fear when she pretended to accede to the threat.

Compare also cases such as United States v. Barnow, 1915, 239 U.S. 74, 36 S.Ct. 19, 60 L.Ed. 155, holding that there could be a conviction for false pretense of holding a non-existent office under a non-existent officer of the United States; and Thomas v. United States, 9 Cir., 1954, 213 F.2d 30, holding that one who falsely pretends to be a United States Senator and assumes authority as such, violates the federal false personation statute, notwithstanding the authority assumed [ordering stay of execution] is in fact not within the power of a duly elected Senator to exercise.

I therefore find that the defendants, Frank Paul Ventimiglia, James Harold Parran, and Weather-Mastic, Inc., conspired wilfully [18] to violate the provisions of 29 U.S.C.A. § 186(a) by payment of money to a representative of Weather-Mastic, Inc.'s employees, who were employed in an industry affecting commerce, and that said defendants are guilty under Count I of the indictment.

**17.** Williamson v. United States, 1908, 207 U.S. 425, at pages 446–447, 28 S.Ct. 163, at page 170, 52 L.Ed. 278, where the court said:

"With great elaboration it is insisted in argument that the indictment charges no crime, since there can be no such thing as a conspiracy to commit the offense of subornation of perjury. While the statutes of the United States cause every person who procures another to commit perjury to be guilty of subornation of perjury, it is said there is no punishment by statute, as at common law, for a mere attempt by an individual to induce the commission of perjury. This being so, the argument is that a charge of conspiracy to suborn, etc., perjury, is in the nature of things but a charge of an attempt to suborn perjury, which amounts only to the charge of a conspiracy to do an act which is not a criminal offense. But the proposition wholly fails to give effect to the provisions of the conspiracy statute (U.S.Rev.Stat. § 5440 * * *), which clearly renders it criminal for two or more persons to conspire to commit any offense against the United States, provided only that one or more of the parties to the conspiracy do an act towards effecting the object of the conspiracy. In other words, although it be conceded, merely for the sake of argument, that an attempt by one person to suborn another to commit perjury may not be punishable under the criminal laws of the United States, it does not follow that a conspiracy by two or more persons to procure the commission of perjury, which embraces an unsuccessful attempt, is not a crime punishable as above stated. The conspiracy is the offense which the statute defines without reference to whether the crime which the conspirators have conspired to commit is consummated. And this result of the conspiracy statute also disposes of an elaborate argument concerning the alleged impossibility of framing an indictment charging a conspiracy to suborn perjury, since it rests upon the assumption that as the conspirators could not, in advance, know when they entered into the conspiracy that the persons would willfully swear falsely to what they and the conspirators knew to be false, there could be no conspiracy to suborn."

**18.** 29 U.S.C.A. § 186(d).