Frank Paul **VENTIMIGLIA**, James Harold Parran, and Weather-Mastic, Inc., Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 7319.

United States Court of Appeals Fourth Circuit.

Argued Jan. 7, 1957.

Decided March 11, 1957.

Robert F. Skutch, Jr., Albert H. Blum, and Mark D. Coplin, Baltimore, Md. (Weinberg & Green, Baltimore, Md., on brief), for appellants.

Walter E. Black, Jr., U. S. Atty., Baltimore, Md., for appellee.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOBELOFF, Circuit Judge.

The Taft-Hartley Act forbids the payment of money by an employer subject to its provisions to "any representative of any of his employees." 29 U.S.C.A. § 186(a). The defendants were indicted for three substantive violations of this law and for conspiracy to violate it. At a trial before the District Judge, sitting without a jury, the defendants were acquitted of the substantive offenses, but convicted of the conspiracy. The sufficiency of the evidence to sustain the conviction is the question raised by this appeal.

Weather-Mastic, Inc., is a non-unionized contractor engaged in the insulating and weather-proofing business. Parran is its general manager and Ventimiglia its labor relations adviser. In the prevailing industry practice, workers are required to have in their possession some evidence of union membership, if in fact affiliated with a union, or "working cards," which the union customarily issues to a limited number of non-union men seeking work on union jobs. Having been accepted as a sub-contractor for a job in Alexandria on which Stone and Webster, a unionized company, was general contractor, Weather-Mastic faced the need of obtaining working cards for its men. Joseph Martin, business agent of Local No. 80 of United Slate, Tile and Composition Roofers, Damp and Water Proof Workers, complained to Weather-Mastic that its workmen were carrying "working cards" issued, not by him, but by Ventimiglia, who was then in the service of Weather-Mastic, Inc., but had earlier been the business agent of the union. After discussion, Martin was persuaded by the defendants to issue

working cards to Weather-Mastic's employees, for which the defendants agreed to pay Martin One Hundred Dollars each month.

Martin's duties as business agent for Local No. 80 are said to be of the usual type: negotiating wage contracts and working conditions, representing the union members and acting as peacemaker between employers and union members in respect to disputes or grievances. Martin never represented any of Weather-Mastic's employees in any of these respects. He did issue working cards signed by him, which he delivered to Ventimiglia. For this he received several monthly payments from the defendants.

An additional duty of union business agents is to check on the union credentials of men engaged on a union job who are not members of his union. The evidence is that if another business agent was skeptical of an employee's working card, the usual procedure would be to make inquiry of the agent who had issued the card, and if he verified its validity, that ordinarily would be enough to satisfy the inquirer. While Weather-Mastic's men were never asked to show their cards, except by the Federal Bureau of Investigation (to whom Martin had reported his agreement with the defendants), the significance sought to be attached to this fact is that Martin, it is said, was prepared to stand behind and vouch for Weather-Mastic's employees if questions as to their status should ever arise.

■ It is, of course, beyond dispute that a punishable conspiracy may exist independent of the actual commission of the substantive offense which was the object of the conspiracy. This need not be labored. However, there can be no conviction for conspiracy to commit an offense against the United States if the act that the alleged conspirators agree to do has not been made unlawful, and is not planned to be accomplished in an unlawful manner.

■ According to the Court's findings, the testimony affirmatively established that the corporate defendant's employees were not at any time members of Martin's union, and that there is no evidence that they authorized or subsequently ratified Martin's representing them; and the Court added—correctly, we think—that there is here no representation by operation of law. If Martin was no representative of the employees, Section 186(a) did not apply to him. The Court concluded, as we think was required in these circumstances, that the section was not violated, and he entered the not guilty verdict as to the three substantive counts.

In considering the conspiracy count, however, the Court predicated a verdict of guilty upon the theory that while the defendants did not desire Martin to represent the employees in *all* respects, they did intend to deal with him as their employees' representative in issuing cards evidencing the union's willingness to permit them to work on union jobs. The opinion says: [145 F.Supp. 43] "He [Martin] was to furnish the necessary indicia of union membership, and if questions arose, handle the matter so that there would be no interruption to work. * * * He was not to organize them, or to negotiate on their behalf with the employer as to wages. But there can be no doubt that the defendants intended Martin to do acts which a representative of employees would be expected to do—insure the availability and continuity of work. Likewise, Martin could have become the formal representative of the employees had they initiated the issuance of cards, or accepted or used them knowing the reasons for which, and the circumstances under which the cards were issued."

Thereupon, the Court concluded that, for a period at least, defendants intended to deal with and dealt with Martin as a representative of their employees. He added that "the defendants cannot avoid the natural consequences of their conduct by a simple denial that Martin

was such a representative when the evidence is that they intended him to be and dealt with him in that capacity; nor does the fact that they did not want him to be (and indeed forbade him to be) the employees' representative in certain respects, prevent him from being such representative in the limited field in which he was to, and did, act."

In analyzing the evidence in connection with the conspiracy count, the District Judge, we think fell into error. The testimony, it seems to us, does not lend itself to the treatment given it. Plainly enough, the defendants did not deal with Martin as their employees' representative, and never intended to deal with him as such. They did not want him to approach their employees or organize them, or represent them, and he did not do so. As the Court declared in a subsidiary finding of fact, the defendants induced Martin *not* to organize or represent the employees. The cards he issued were not "indicia of union membership;" on the contrary, they were working cards such as are customarily issued to non-members, to workers *not* represented by the union. Employees represented by the union or by its business agent require no such cards. The purpose of the cards is to sanction work by *non*-union men, who are unrepresented. So, far from treating them as union members and thus under representation by Martin, he treated them as the only class of workers who could carry such cards, namely, persons not in the union or represented by it or by its officers.

It is not suggested that if Martin had in fact been the employees' representative, the defendants could have escaped the penalties of Section 186(a) or of the conspiracy statute, on the ground that he acted faithlessly to the employees and for the advantage of the employer. That is not the defense. The defense, which the undisputed testimony establishes, is that Martin did not represent the employees, was not asked by the men to represent them in anything, did not take them into his union, did not attempt to take them in, or pretend to anyone that he had taken them in, or that he had become their representative in any sense. He avoided all contact with them and did not assume to represent them. At the employer's instance, he issued cards saying that certain employees who were not union men might work without objection from the union— a practice well established in respect to workers not represented by the union, and only as to such. The cards were not "indicia of union membership"; they were the opposite of this.

We need not on this record consider whether falsely indicating that the employees were members, would have made the statute applicable. The fact that the toleration of such non-union men on the job may have been agreed to by Martin, with the defendants, for motives less than upright and sincere to the union he represented, would not convert him into a representative of the defendants' employees who were not in the union and never sought to be, and who never had any relation whatever to Martin as their representative in any sense. The parties were under no misapprehension whatever as to Martin's status. He was not the representative of Weather-Mastic's employees, and no one concerned thought otherwise.

A criminal statute is not to be stretched to cases not covered, merely because it may seem to a court that Congress would have done well to cover them. Even when the court may feel that if the omission had been called to the attention of Congress, it might have written the statute differently to cover the omitted case, the Court is not empowered to exercise the task of revision. The section of the law under consideration did not in broad terms make it a crime for an employer to pay money to a representative of a union for acting disloyally to his union, or for not acting diligently to further the union's organizing program, or for refraining from becoming the employee's representative, or for otherwise influencing the union official's conduct. Section 186(a) is not

so broad. The crime it denounces is that of paying money "to any representative of any of his employees," and Martin was not the employees' representative, formal or informal, as the trial court correctly noted in connection with the substantive counts.

The furtiveness with which the defendants acted does not convert into a crime what Congress has not made criminal. Whatever opinion one may have as to the moral quality of what was done, it must be said that it is not what the statute forbade. To borrow a phrase from Judge Bryan, speaking for this Court in a not too dissimilar context, Woelfel v. United States, 237 F.2d 484, 488, while the conduct "would be contemptible, it would not be indictable." The agreement proved against the defendants is not one to violate Section 186(a), and the conviction under this indictment cannot stand.

The prosecution's reliance on United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 403, 100 L.Ed. 335, is misplaced, for it is readily distinguishable. There the employees were members of the International Longshoremen's Association. It was their bargaining agent, and Ryan, as its president, conducted all union negotiations on the employees' behalf and for years had signed all their collective bargaining agreements. He was indicted for accepting $2500.00 from the employer of certain union members, and he argued that the union, not he, was the employees' representative within the reach of Section 186(b) of the Taft-Hartley Act, the complementary section to 186 (a), which section 186(b) forbids acceptance of money or other thing of value from an employer by a representative of his employees. The Supreme Court held that the law "meant to include someone in the position of respondent Ryan, who represented employees both as a union president and principal negotiator." The representative status so easily recognizable in such a situation affords no analogy to the strained theory of representation advanced here.

The conservatism with which the courts approach the interpretation of a criminal statute is illustrated in Viereck v. U. S., 1942, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734. An Act of Congress, 22 U.S.C.A. § 611 et seq. provided in one section that every person acting as " 'agent of a foreign principal,' " either as public-relations counsel, publicity agent, or representative, must file a registration statement with the Secretary of State, disclosing the contract with his principal, its terms, and the names of all contributing to his compensation. The Secretary of State, authorized by another section of the statute to make rules and to require details of the registrants' activities, prescribed a form designated, " 'Comprehensive statement of nature of business of registrant.' " The defendant was an agent for German principals in conducting extensive propaganda in the United States. The statement he filed with the Secretary of State failed to disclose many activities in which he engaged on his own account in propaganda of precisely the same character and directed to the same end as that for which he was paid by his foreign principals.

The Supreme Court, strictly construing the criminal statute, held that the details of the registrant's activities as to which the Secretary could require disclosure must be deemed to refer to his activities as foreign agent. Accordingly, the Court decided, the " 'Comprehensive statement of [the] nature of business of [the] registrant' " had to be limited to his business as "agent of a foreign principal." It therefore was held to be error for the trial judge to charge that "it is sufficient if you find that he engaged in the activities, whether on behalf of his foreign principal or principals or on his own behalf." The fact that the evidence would justify a finding that the activities were in fact for the foreign principal did not save the conviction, because it was fatally erroneous for the charge to obscure the distinction between activities for the foreign principal, which were within

the coverage of the law, and others, which were not. Chief Justice Stone said, 318 U.S. at pages 243–244, 63 S.Ct. at page 564 "While Congress undoubtedly had a general purpose to regulate agents of foreign principals in the public interest by directing them to register and furnish such information as the Act prescribed, we cannot add to its provisions other requirements merely because we think they might more successfully have effectuated that purpose."

It was argued for the Government in that case, as it is urged upon us, that to adopt the narrower interpretation of the statute would make it a " 'half-way measure.' " The Supreme Court turned this argument aside, as follows: "* * * men are not subjected to criminal punishment because their conduct offends our patriotic emotions or thwarts a general purpose sought to be effected by specific commands which they have not disobeyed. Nor are they to be held guilty of offenses which the statutes have omitted, though by inadvertence, to define or condemn. For the courts are without authority to repress evil save as the law has prescribed it and then only according to law." Viereck v. U. S., supra, 318 U.S. at page 245, 63 S. Ct. at page 563. See also United States v. Evans, 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823.

The Government contends that a conspiracy may be punished even if the objective of the conspirators cannot be achieved, but the conspirators mistakenly think it can be. Even assuming that the defendants intended to treat Martin as their employees' representative, though in fact he was not, such a theory cannot avail to sustain the prosecution. The Government has referred us to cases in which conviction for conspiracy has been upheld despite the fact that, unknown to the conspirators, the object of the conspiracy was impossible of accomplishment, as where pickpockets conspired to rob an intended victim, but were frustrated by the fact that his pocket was empty. Such unexpected physical impossibility would not prevent successful prosecution for conspiracy.

But the present case is not comparable to the attempt to pick an empty pocket. The analogy to the present case would be closer if we assumed an attempt or conspiracy to pick the pocket of what is merely a wooden dummy. Criminal liability in such a case would seem highly implausible, and it would not save the prosecution to prove that the defendants thought that the object of their design and effort was human. A like distinction is that between an unsuccessful murder attempt due to a faulty gun or a blank cartridge, and a failure due to the fact that the intended victim was merely a block of wood, or a shadow. In the former, there would be a criminal attempt, while in the latter there would not. The distinction in these pairs of cases is readily discernible. It lies in the difference between, on the one hand, a physical impediment to completion of the crime due merely to miscalculation or to the choice of ineffective means which would normally be effective, and, on the other hand, a failure due to an inherent impossibility of completing the crime.

A legal impossibility might also, in many cases, be termed an inherent impossibility, in that the act, though consummated, would not be criminal, and consequently an attempt or agreement to commit it would also not be. See O'Malley v. U. S., 1 Cir., 227 F.2d 332, 335; Woo Wai v. U. S., 9 Cir., 223 F. 412, 415. For instance, an attack on a wooden Indian cannot be an assault and battery (though it might constitute malicious destruction of property), and hence a combination and agreement to do so cannot be a conspiracy to commit assault and battery, although the defendants, before acting, thought the "victim" a living person. Nor is it punishable as attempted rape if the defendant is legally incapable of committing the substantive crime because he is less than fourteen years of age. See Foster v. Commonwealth, 96 Va. 306, 31 S.E. 503, 42 L.R.A. 589, while on the other

hand, if impotency prevents consummation, the attempt is criminal. See Hunt v. State, 114 Ark. 239, 169 S.W. 773, L.R.A.,1915B, 897.

Such distinctions underlie the decision in the celebrated case of People v. Jaffe, 185 N.Y. 497, 78 N.E. 169, 9 L.R.A., N.S., 263, where the defendant was acquitted of attempting to receive stolen goods, because, though unknown to him, the goods were not stolen, and he could not be guilty of the substantive offense. Cf. the earlier case of People v. Gardner, 144 N.Y. 119, 38 N.E. 1003, 28 L.R.A. 699. See also O'Kelley v. U. S., 8 Cir., 116 F.2d 966, where it was held that there could be no conspiracy to commit larceny of an interstate shipment, because there could be no substantive violation inasmuch as the goods had lost their interstate character. Similarly, if one thinks that a uniformed doorman is a police officer and bribes him not to tag his car, it is no crime, and neither the attempt nor the conspiracy can be, for there is an inherent or legal impossibility of consummating the offense, although the act itself was completed. Likewise, where one mistakenly believes a certain individual is the union representative of his employees, the misconception cannot sufficiently negative the impossibility of committing the substantive offense so as to provide the basis for a conspiracy conviction. But where the object of a bribe is a draft board official of the United States who, but for the defendant's mistake of registering with the wrong board, would have had no jurisdiction over the defendant, the impossibility was not inherent but was due simply to a prior mistaken course of action. See United States v. Schanerman, 3 Cir., 150 F.2d 941.

The line between the categories in this often vague and unsettled area of the law is not easily drawn, and there may be cases which fit as well into one classification as another. There may indeed be other concepts of categorization based on differing underlying theories of criminal punishment in themselves not readily gleaned from the cases and writings on the subject. It is beyond the needs of the present case to enter into such speculations. For interesting analyses, see People v. Jaffe, supra, and 41 Harvard Law Review 821, 78 Pa.Law Review 962, 70 Harvard Law Review 422.

Even were we to doubt the foregoing propositions and their application here, the present case is on the facts of an even more extreme variety, for it is said merely that the defendants *intended* to deal with Martin as their employees' representative. The previous example of the doorman will suffice to show the fallacy of basing a conviction on such a fact. Had the defendant in that hypothetical case, knowing that the doorman was not a police officer, nevertheless intended to deal with him as such, it could certainly not be said that he attempted to bribe a police officer.

The analogies suggested by the Government to United States v. Perlstein, 3 Cir., 126 F.2d 789, and United States v. Hood, 343 U.S. 148, 72 S.Ct. 568, 96 L.Ed. 846 are not convincing. In the Perlstein case, it was held merely that where a conspiracy to obstruct justice in the courts had begun prior to any legal proceedings and continued after the institution of the proceedings, there could be a conviction for such conspiracy, although there could be no conviction for the substantive offense at the inception of the conspiracy. And in the Hood case, the decision was that the crime of receiving money in consideration of a promise to use influence to secure an appointive office included future offices reasonably expected to be created. That decision, however, involved the broad scope of the substantive offense; it did not involve a proposal to include within the scope of the conspiracy, a plan to commit what is at most a shadowy counterpart of the substantive offense denounced in the statute.

We conclude, therefore, that there could be no conviction under this indictment even if the defendants mistakenly thought that Martin was a rep-

resentative of Weather-Mastic's employees. Even less can a conviction be sustained when it is clear beyond dispute, not only that he was not the employees' representative, but that no one concerned thought or pretended that he was.

Reversed.