UNITED STATES of America, Appellee,

v.

Thomas PECORA, James Paone, Appellants.

Appeal of Thomas PECORA.

Appeal of James PAONE.

Nos. 84–5698, 85–5386.

United States Court of Appeals, Third Circuit.

Argued Sept. 12, 1985.

Assigned April 18, 1986.

Decided July 2, 1986.

Rehearing and Rehearing In Banc Denied Aug. 21, 1986.

Dino D. Bliablias (argued), Stein, Bliablias, McGuire & Pantages, Livingston, N.J., for Thomas Pecora.

Justin P. Walder (argued), Walder, Sondak, Berkeley & Brogan, Roseland, N.J., for James Paone.

Claudia J. Flynn (argued), U.S. Atty's. Office, Newark, N.J., for appellee.

Before SEITZ, BECKER, and ROSENN, Circuit Judges.

**OPINION OF THE COURT**

SEITZ, Circuit Judge.

## I.

The defendants, James Paone and Thomas Pecora, appeal judgments of conviction against them in the district court on two counts of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq. We have jurisdiction under 28 U.S.C. § 1291.

## II.

The defendants were convicted by a jury of violations of both sections 1962(c) and (d) of RICO, which make it unlawful to conduct (section 1962(c)), or to conspire to conduct (section 1962(d)), an enterprise through a pattern of racketeering activity. Defendant Pecora, general manager of Federico Trucking, Inc. (FTI),[1] was charged with making payments, mainly in the form of salaries "paid" to a succession of no-show employees over the course of a decade, to defendant Paone, business agent and recording secretary of Local 863 of the International Brotherhood of Teamsters. These payments were allegedly the product of a conspiracy including Paone and Pecora, and were intended to influence Paone in the conduct of the business of Local 863. The jury found that the payments violated sections 302(a) and (b) of the Taft-Hartley Act, ch. 120, 61 Stat. 157 (1947), *as amended by* section 505 of the Labor-Management Reporting and Disclosure Act, Pub.L. 86–257, 73 Stat. 537 (1959), *codified at* 29 U.S.C. § 186(a) and (b). The Taft-Hartley violations formed the predicate acts required to establish a "pattern of racketeering activity" under 18 U.S.C. § 1961(1)(C).

On appeal, the defendants raise a multitude of issues which they argue warrant reversal of their convictions. To avoid repetition, we will discuss in detail below the facts pertinent to each issue, and content ourselves with a cursory sketch of the general scheme here. We describe the facts in the light most favorable to the government.

FTI, a corporation doing business in New Jersey, was established in 1972, and entered into a contract with Foodhaulers Inc., a subsidiary of Wakefern Food Corp., whereby Foodhaulers subcontracted its delivery of bakery products for Wakefern to FTI. Truckdrivers employed directly by Foodhaulers were represented by Local

---

1. Biagio Federico, owner and president of FTI, was originally a codefendant. He was severed from this trial due to illness.

863. FTI was wholly owned by Biagio Federico, who also owned S. Federico Trucking in New York. S. Federico had a longstanding union relationship with Teamsters Local 202. When FTI was established, a jurisdictional dispute arose among several locals including 863 and 202 as to which Teamsters local would represent FTI employees. The dispute was considered by the New York and New Jersey Joint Councils of the Teamsters, and apparently resolved pursuant to a 1963 Memorandum of Understanding between those Councils to allow Local 202 to follow the work and represent the FTI drivers.

The relationship between Foodhaulers and the FTI drivers, however, bore many of the indicia of an employer/employee relationship. For example, Foodhaulers accepted the applications of FTI drivers, required them to have medical examinations, administered driving tests to them, issued them identification cards, and had the power to fire them.

The government claimed that FTI in the persons of Pecora and Biagio Federico conspired with Paone to funnel payments to him in order to prevent Local 863 from asserting that the subcontract was a sham intended to allow Foodhaulers to hire non-863 drivers in violation of its collective bargaining agreement, an assertion that could have interfered with FTI's subcontract. Paone would therefore use his influence as a high official in Local 863 to ensure that Local 863 would neither object to the subcontract or attempt to assert jurisdiction over FTI's driver employees.

From 1972 to 1981, a number of no-show employees were paid salaries, which were routed to Paone through middlemen. By 1981, the payments totalled approximately $235,000. In addition, FTI made several thousand dollars in welfare fund contributions on behalf of Paone's sister, despite the fact that she was never employed by FTI.

After the jury found the defendants guilty of both RICO counts, the district court denied motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and motions for a new trial based on trial error and newly discovered evidence under F.R.Crim.P. 33. This appeal followed.

### III.

The defendants contend that the district court erred in denying their motions for a judgment of acquittal because, on the facts presented to the jury, there was insufficient evidence as a matter of law to find that they had violated sections 302(a) and (b) of the Taft-Hartley Act, 29 U.S.C. §§ 186(a) and (b). In reviewing the district court's denial of defendants' motions, we determine whether there is substantial evidence, viewed in the light most favorable to the government, to support a jury's finding of guilt beyond a reasonable doubt as to the elements of the crime charged. *Government of the Virgin Islands v. Williams*, 739 F.2d 936, 940 (3d Cir.1984). The government must be given the benefit of inferences that may be drawn from the evidence, and the evidence may be considered probative even if it is circumstantial. *Id.* In addition, " '[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt.' " *Id., quoting United States v. Allard*, 240 F.2d 840, 841 (3d Cir.), *cert. denied*, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957). Of course, to the extent we must review the district court's statutory interpretations or other decisions on matters of law, our review is plenary.

Section 302(a) makes it:

(a) ... unlawful for any employer ... or any person who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of

such employer who are employed in an industry affecting commerce; or

. . . . .

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of such labor organization.

Section 302(b) makes it "unlawful for any person to request, demand, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a)."

The essence of the defendants' arguments is that, under the facts, Paone was not a "representative" of FTI employees, that circumstances prevented Local 863 from admitting FTI employees to membership, and that payments to Paone could not have been made with intent to influence him in his capacity as an official of Local 863. Payments in violation of any one of the subsections of section 302(a), of course, would suffice to make out a Taft-Hartley violation. We are therefore called upon to construe the language of section 302 to see whether the facts here fall within its scope. We will take up each subsection in turn.

### A.

The facts relevant to section 302(a)(2) are not complex. First, a number of FTI's office employees were dues paying members of Local 863. Some of those employees were supervisory personnel and we will assume that they could not be represented by the Local under the National Labor Relations Act. However, other employees who were Local 863 members were clerical, non-supervisory personnel. The defendants maintained at trial that the office employees paid dues to the union for the sole purpose of participating in the insurance program operated under Local 863's welfare fund, and therefore that Local 863 was not their representative within the meaning of section 302.

At least one office employee testified that Local 863 never represented him with respect to the terms and conditions of employment, and there was testimony to the effect that a union and its welfare fund are two distinct entities. Local 863 never negotiated a collective bargaining agreement for the office employees. When the office employees transferred to another health plan, they were put on Local 863's withdrawal rolls.

The seminal case construing the term "representative" is *United States v. Ryan*, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956). In *Ryan*, the petitioner argued for a very restrictive interpretation, but the court held that "a narrow reading of the term 'representative' would substantially defeat the Congressional purpose." 350 U.S. at 304, 76 S.Ct. at 404.

*Ryan* did not purport to define the *outer* limits of the scope of the term "representative", but instead stressed its breadth. The Court noted that a narrow reading of the statute would prevent applying section 302 to "other individuals as trustees [of welfare funds]," 350 U.S. at 305, 76 S.Ct. at 404, and that Congress had "enlarged [the scope of section 302 to] reach ... a 'case where the union representative is shaking down the employer.'" 350 U.S. at 306, 76 S.Ct. at 405, *quoting* Senator Taft.

The defendants contend that *Ryan* stands for the proposition that dues paying members of a union local are not represented by that union's officers if the purpose of their membership is simply participation in the union's welfare fund. They would have us adopt the following language from *Ryan*: "'For purposes of this section [§ 302 of Taft-Hartley], the term "representative" means any labor organization which, or any individual who, is authorized or purports to be authorized to deal with an employer ... concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.'" *Ryan*, 350 U.S. at 306, n. 6, 76 S.Ct. at 405, n. 6, *quoting* section 302(g) of the Senate version of section 302.

■ *Ryan* does not support such a reading of section 302, however.[2] The Senate's proposed definition was omitted from the final version of section 302. Instead, Congress adopted by reference in section 501(3) of Taft-Hartley the definition of representative found in section 2(4) of the National Labor Relations Act, 29 U.S.C. § 152(4): "The term 'representative' includes any individual or labor organization." The NLRA's language is considerably broader than the definition that was deleted. *See Ryan,* 350 U.S. at 301, 76 S.Ct. at 402. While the Court made it clear that section 302 covers at least the scope of proposed section 302(g), it concluded with the broad statement "that § 302 prohibits payments by employers to individuals who represent employees in their relations with the employers." 350 U.S. at 307, 76 S.Ct. at 405. *Ryan* thus imposes no limitation on the subject matter of the representation.

With respect to the FTI employees who were members of Local 863, then, we must decide whether the jury could find that Local 863 represented them in their relations with FTI, even assuming that the only subject matter of the relationship was the inclusion of the employees in Local 863's pension fund. The district judge instructed the jury that the fact that the office employees were members of Local 863 was not dispositive and he told them that they might consider the payment of dues, the lack of a collective bargaining agreement, and other factors in their decision.

■ The district court's instructions were consistent with the case law interpreting section 302. In *Mechanical Contractors Ass'n v. Local Union 420,* 265 F.2d 607, 611 (3d Cir.1959), we held that persons designated by a union to administer a fund derived from employer contributions were representatives within the meaning of section 302, even where none of the fund's purposes included collective bargaining for the employees or representation on the job or in grievances. We rejected the contention that section 302's applicability depended on the "character of the functions performed by the joint administrators." 265 F.2d at 611. Thus, even if FTI's office employees belonged to Local 863 for the sole purpose of participation in the welfare fund, Local 863 and its officers would be "representatives" within the scope of section 302. *See also Sheet Metal Contractors Ass'n v. Sheet Metal Workers International Union,* 248 F.2d 307, 315 (9th Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 367, 2 L.Ed.2d 354 (1958).

Further, participation in an insurance program itself may be considered a part of the wage package given to employees sufficient to make union officials with no other connection to the workers involved representatives within the meaning of section 302. *See Sheet Metal Contractors Ass'n,* 248 F.2d at 314 (2½ cents per hour welfare fund contributions sought by Local 74 for Local 104 workers working temporarily in its jurisdiction were "on behalf of ... members of Local 104 temporarily in the northern counties and in respect to the working conditions and wage scales of ... 104 members;" thus, joint board members of Local 74 could be considered representatives).

When employees participate in a welfare fund, there must be some determination of the amount of the contributions on their behalf, the mechanics of payment, the claims procedure, the means by which claims disputes are resolved, and so on. There is no need under the statute to show that the union officials actually negotiated or personally handled the amount of the payments to the welfare fund, the extent of the benefits package available through the fund, or the award of benefits. The term representative

---

**2.** Defendants presented two labor law professors as expert witnesses. Both testified with respect to the definition of representative and whether Local 863 was such a representative. Defendants now point to this "uncontradicted" testimony as conclusive on the meanings of various terms in section 302. Of course, the opinions of witnesses on matters of law or on questions of ultimate fact, to the extent they depend on legal issues, are binding neither on this court, nor on the district court.

'includes any person who is empowered, authorized, or designated in any way, directly or indirectly, by any employee or employees, to represent such employee or employees in any matter relating to their wages or hours or working conditions .. in any responsible dealing with the employer involving such matters. If a person be so authorized to act it is not necessary that he actually exercise all or any of the powers conferred upon him.' *Brennan v. United States,* 240 F.2d 253, 264 (8th Cir.), *cert. denied,* 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723 (1957) (quoting and adopting the district court's jury charge). It is also not necessary for the union to represent a majority of a company's employees. *See United States v. Pecora,* 267 F.2d 512, 515 (3d Cir.1959) ("some Union members" in crew sufficient).

In *United States v. Lanni,* 466 F.2d 1102, 1108 (3d Cir.1972), we held that:

[o]ur purpose is to interpret a statute so that it fulfills the legislature's purpose and not to construe it, as appellants would have us do, to subvert the legislative intent. The statutory purpose [of section 302] is clear: The stamping out of 'all forms of bribery' between management and labor officials.

It was certainly reasonable, given the evidence in this case, for the jury to conclude that Paone as an official of Local 863 represented the office employees because they were provided with welfare benefits through the union plan and their membership in the local. Such a conclusion is consistent with both the facts and the definition of representative under section 302.

### B.

The facts with respect to the elements of section 302(a)(2) are not complicated either. The crucial question was whether Local 863 or any of its officers sought to represent or would have admitted to membership the driver employees of FTI. It was admitted that FTI operated within the territorial jurisdiction of Local 863. The defendants claim that several factors rendered it impossible for Local 863 to admit the FTI drivers to membership. They point to a 1963 Memorandum of Understanding between the New York and New Jersey Joint Councils of the Teamsters which purportedly allowed union locals to follow the work in cases such as the creation of FTI, and to a decision of a Teamsters Joint Council awarding jurisdiction over FTI to Local 202 based on that memorandum of understanding. They contend also that the "contract bar" rule operated to prevent Local 863 from admitting the FTI drivers to membership.[3]

The government argued essentially that Local 863 could assert a colorable claim to the right to organize the FTI drivers, either on the basis of territoriality in defiance of the Teamsters Joint Council, or on the basis that indicia of an employment relationship between Foodhaulers and the FTI drivers rendered the subcontract a sham. Local 863's potential for disrupting FTI's subcontract provided the motive and purpose behind the payoff scheme, and the government argued that such a relationship is within the ambit of the "would admit to membership" language of section 302(a)(2).

The district court held that the legal or practical impossibility of organizing the FTI drivers could be considered by the jury, but that it was not conclusive as a matter of law on the question whether Local 863 would have admitted the drivers if it could have. It concluded that a rational jury could find that Local 863 would have admitted the FTI drivers despite the memorandum of understanding. It noted that Local 863 had already participated in a

---

**3.** The contract bar rule is a creation of the National Labor Relations Board that limits the ability of rival unions to attempt to organize workforces which are already represented by another union and working under a collective bargaining agreement. It is implausible that the contract bar could have prevented Local 863 from asserting its jurisdiction during the entire decade that the scheme was in operation. *See* R. Gorman, *Labor Law* 54–59 (1976) (contract bar rule provides for open period at least every three years during which insurgent unions can challenge incumbents for jurisdiction).

jurisdictional dispute concerning FTI, indicating a desire to represent the drivers, and that the jury could conclude that it might do so again.

The defendants argue that the phrase "would admit to membership" means that, at the time the payoffs were made, there must have been a present intention by FTI drivers to apply for membership to Local 863 or a present intention by FTI itself to hire employees who would and could be admitted to membership in Local 863, and does not apply when, as defendants contend here, representation was factually and legally impossible. On its face, this argument would seem to render the "would admit to membership" language superfluous, since section 302(a)(2) also prohibits payments to officers of a labor organization which "seeks to represent" a group of employees, language more suited to the "present intention" situation than the phrase at issue here.

We hesitate to "construe a statute to make it redundant of itself," *United States v. Palmieri*, 630 F.2d 192, 199 (3d Cir. 1980). An examination of the legislative history supports a view that the "would admit to membership" sweeps more within its net than the defendants would allow. Section 302 originally proscribed only payments to representatives. However, it was amended to include the disputed language in 1959 by section 505 of the Labor-Management Reporting and Disclosure Act, Pub.L. No. 86–257, 73 Stat. 519. The Senate Report stated:

Racketeering, crime, and corruption must be stamped out in the labor and management field as elsewhere. The committee bill carries strong measures for driving criminals from labor unions. Its provisions will also bring to light possible conflicts of interest and similar shadowy transactions through which unscrupulous union officials and employers sacrifice the welfare of employees to personal advantage. [The amendments strengthen] section 302 ... by making it applicable to all forms of extortion and bribery some of which may slip through

the present law.... The committee bill proposes to close the loopholes [of the 1947 version] ... which both employer representatives and union officials turned to advantage at the expense of employees.

Sen.Rep. No. 187, 86th Cong. 1st Sess., 1959, *reprinted in* 1959 U.S.Code Cong. & Admin.News 2318, 2329–30 [hereinafter S.Rep. No. 187].

The Senate Committee cited *Ventimiglia v. United States*, 242 F.2d 620 (4th Cir. 1957), as an example of a loophole that the amendments were designed to close. In *Ventimiglia*, a union officer issued working cards to employees of a non-union contractor to permit them to work without joining the union. In exchange for issuing the cards, the employer paid the union official $100 a month. The court held that because the payoffs were designed to "induce ... [the officer] *not* to organize or represent the employees," 242 F.2d at 623 (emphasis in original), "neither the roofers' union nor the business agent was technically a 'representative' of any of the employer's employees." Sen.Rep. No. 187 (describing *Ventimiglia*), *reprinted in* 1959 U.S.Code Cong. & Admin.News at 2330. The court reversed the official's conviction and Congress decided to overrule that result legislatively.

In our situation, the alleged motivation behind the payoff scheme was identical to that in *Ventimiglia*. In *Ventimiglia*, the employees were unrepresented. Thus, we must decide whether the fact that the FTI drivers were represented by another local distinguishes our situation from *Ventimiglia* as a matter of law and takes it out of the range of payoff schemes that Congress intended to prohibit.

An analysis of the harm done to both the FTI and Local 863 employees persuades us that the distinction between this case and *Ventimiglia* is not great enough to remove it from the sweep of section 302(a)(2). The payoffs to Paone deprived the FTI drivers of the freedom to decide whether to be represented by another local when and if the choice was presented to them, and de-

prived Local 863 members of the possibility of strengthening their union both numerically and with respect to the consistency of representation within the geographic jurisdiction of the local. We think that Congress in amending section 302 focused on the potential for interference in the dynamics of the labor movement and not on whether the payoffs actually caused workers to go unrepresented. There was no guarantee that the workers in *Ventimiglia* would have chosen to be represented by the union whose official was paid off, or that he could have successfully stopped them from working if they did not join. The company avoided the potential for conflict by paying the union official to ignore his duty to his union, and that was what Congress desired to prohibit by amending section 302.

■ The LMRDA's declared purpose is that labor officials serve as fiduciaries, *see* 29 U.S.C. § 501, and on that basis, Congress decided that "using one's union office for personal financial advantage—playing both sides of the street—is a conflict of interest that corrupts and weakens the national labor movement." *United States v. Cody*, 722 F.2d 1052, 1057 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). We believe that the "would admit to membership" language was intended to incorporate situations where, as here, a union official receives bribes from management in exchange for discouraging his union from asserting its claim to jurisdiction, whether or not another local is involved.

■ The defendants' argument that organization of the FTI drivers was a practical or legal impossibility does not dissuade us here. In many cases there may be practical or legal impediments to the actual organization of a group of workers, and there will undoubtably be some situations in which the impediments are harder to overcome than in others. We are unwilling to hold that, where an employer pays off a union to keep it from attempting to represent its workers, the existence of possible roadblocks to the actual accomplish-

ment of the union's "threat" will conclusively render section 302(a)(2) inapplicable.

While it may be that some impediments are so insurmountable as to prevent the application of section 302(a)(2) as a matter of law, to describe the impediments in this case as rendering the potential organization of the FTI drivers impossible is mere hyperbole. On this record, the existence of impediments to the organization of the FTI drivers might have made it more difficult for Local 863 to attempt to organize them, but certainly did not make such an attempt impossible. Local 863 could, for example, have sought to have the Joint Council reverse itself, or it could have challenged the subcontract with Foodhaulers as a violation of the collective bargaining agreement. Even if the odds were against the success of such an attempt, we do not think that payments to union leaders to prevent such attempts are necessarily beyond the scope of section 302(a)(2). Assuredly, then, it was not error to submit this issue to the jury in this case.

To hold that section 302(a)(2) requires a present intention rather than a potential to attempt to organize a group of employees would allow employers to evade the operation of section 302 by timing their payoffs in such a way that they were paid at times when a union local could not assert its right, and would require an inquiry into the subjective intentions of employees, employers, and union officials. Congress sought to avoid leaving loopholes for evasion of the prohibitions of section 302 by "proscribing payments to any labor organization, or any officer or employee, which is seeking to represent or would admit to membership any of the employees of the employer." Sen.Rep. No. 187, *reprinted in* 1959 U.S. Code Cong. & Admin. News at 2330.

The defendants point to two cases which they claim support their position. In *United States v. Sink*, 355 F.Supp. 1067 (E.D. Pa.), *aff'd mem.*, 485 F.2d 683 (3d Cir. 1973), we affirmed a district court opinion which found substantial evidence to support the jury's finding that a union would have admitted the employer's employees to

membership. In that case, a union official accepted payments of hotel bills at various resorts in exchange for refraining from organizing workers of a corporation that "was actively contemplating expanding," 355 F.Supp. at 1070, into the area of the union's jurisdiction. Noting that section 302 was aimed at "payments by an employer to the labor union representatives of the employer's labor force," *id.*, the court pointed out that the "statute recognized a similar, and possibly greater danger, in comparable situations where the laborers would be organized in the future." *Id.* The court traced the "would admit to membership" language to that concern for future organization.

In its charge to the jury, the court stated that "would admit to membership ... does not mean some indefinite, uncertain, future, vague possibility. It means at the time the acts were performed and done that as of that time there was either a present intention for the employees ... to apply for membership or that there was a present intention for [the company] to obtain work in the Philadelphia area and to employ employees that would and could be admitted to membership." *Id.* at 1071. Defendants rely heavily on this definition, but do not point out that in the very next sentence the court noted that "[t]he charge carefully limited the 'time frame' and thereby may have been more beneficial to the defendant than required." *Id.*

We need not decide whether the language in *Sink* is overly restrictive, as the *Sink* court itself implied, because in our case the defendants are accused of a payoff scheme aimed at getting Local 863 to refrain from organizing a group of employees presently existing within its area of jurisdiction. Thus, Local 863's relationship to the FTI drivers was a good deal *less* tenuous than the relationship at issue in *Sink*.

The same is true of the second case relied on by defendants, *United States v.*

*Cody*, 722 F.2d 1052 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). In *Cody*, the Second Circuit held that the relationship between the union and the employees was too tenuous to make out a section 302 violation where the employer did not have a contract with the local, did not employ any local members, and there was no evidence that, at the time of the "gifts" to the union official, the employer had actual plans to commence a project that would have required the hiring of local members. In fact, no such project was ever commenced. Thus, the court held, there was an insufficient "nexus" between the union and the company to make out a section 302 violation. The court noted that the language of section 302(a)(2) "requires an *existing* employment relationship ..., not the possibility of a future relationship," 722 F.2d at 1058 (emphasis in original), and went on to point out

> that [section 302(a)(2) ] was added in 1959 for a specific reason—to deal with employers' attempts through bribery of union officials to block unionization of their *present* employees.... In other words, the statute was designed to protect the possible future unionization of present employees, not, as here, the possible future hiring of present union members.

*Id.* at 1058–59 (emphasis in original).

■ *Cody* thus supports our position that the "would admit to membership" language applies to the present situation.[4] It is immaterial to the operation of section 302 whether the purpose of the payoff scheme is to maintain a non-unionized workforce, or to preserve the employer's relationship with a union that he prefers dealing with. Where a payoff scheme exists in a situation where the union "would admit to membership" the employees of the employer, section 302(a)(2) is violated despite roadblocks to the actual organization of the workers. Given our analysis of section 302(a)(2), therefore, we conclude that

---

**4.** We need not and do not decide whether, on the facts presented in *Cody*, we would hold that

no section 302 violation occurred.

there was sufficient evidence for the jury to find that Local 863 would have admitted the FTI drivers to membership.

### C.

The defendants argue that section 302(a)(4)'s scope is limited to acts committed with the intent to affect the collective bargaining process. Incorporating their arguments discussed in the preceding sections, they argue that since there is no basis for finding either that Paone represented the office employees or that Local 863 would admit the driver employees to membership within the meaning of section 302, the payments could not have been made with the requisite intent.

 Again, the defendants would have us read the statute more narrowly than Congress intended and the language of the statute provides. The district court concluded that a reasonable jury could find that payoffs were made to Paone with the intent to influence him in his official capacity, and to insure that Local 863 would not interfere or attempt to interfere with FTI's subcontract. We agree. The statute only requires that the payoffs be intended to influence a union officer "in respect to any of his actions, decisions, or duties as a representative of employees or as ... officer or employee of such labor organizations." Section 302(a)(4). We have already rejected defendants' arguments regarding Paone's and Local 863's relationship to FTI, and there is obviously a sufficient basis for finding that the payments were made with the intent to influence Paone's execution of his duties to the local.

### D.

 Finally, since section 302(b) prohibits the receipt of payments made in violation of section 302(a), making it illegal for union officials to receive what was illegal for management to pay, it is clear that the jury had sufficient evidence to find that section 302(b) had been violated as well. Thus, we find no error in finding that the defendants were guilty of predicate acts in violation of section 302, or in the district court's denial of defendants' motion to acquit.

### IV.

The defendants' next issue concerns the admission at various points in the trial of the out-of-court statements of unindicted coconspirators pursuant to Federal Rule of Evidence 801(d)(2)(E). The out-of-court statements consisted first of a 1979 tape recording of Anthony Carratura, the no-show who became a government informant; Joseph Picco, another of the no-shows; and Fred Paone, one of the middlemen and nephew of defendant James Paone, trying to get their stories straight about what their jobs entailed in anticipation of a government investigation; and, second, testimony concerning out-of-court statements by Sam Botro, another of the middlemen. The tape recording was very damaging to the defense, since it discussed the payoff scheme and implicated James Paone. Picco, Fred Paone, and Botro were all unindicted coconspirators. The defendants claim that the admission of such evidence violated their rights under the Confrontation Clause of the Sixth Amendment.

The defendants originally based their arguments on the alleged failure of the government to demonstrate the unavailability of the coconspirators at trial, relying on our decision in *United States v. Inadi*, 748 F.2d 812 (3d Cir.1984), *rev'd*, —— U.S. ——, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

The government contended as a threshold matter that no proper objection had been made to the introduction of the statements in the district court as required by *United States v. Gibbs*, 739 F.2d 838 (3d Cir.1984) (in banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985). In addition, the government reiterated its disagreement with our holding in *Inadi*. Because the Supreme Court held in *United States v. Inadi*, —— U.S. ——, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), that the *Roberts* unavailability requirements "do not apply to coconspirator statements," *id.* 106 S.Ct. at 1126, we need not decide whether

the unavailability issue was preserved in the district court in our case, nor need we decide whether any of the declarants was properly made available.

Following the release of the Supreme Court's *Inadi* decision, we requested comment from the parties on its effect on their arguments. In their response, the defendants point out that, while the Court held that there was no unavailability requirement in the context of coconspirator statements, it noted that the reliability of the out-of-court statements was not an issue in *Inadi*. 106 S.Ct. at 1124–25, n. 3. The defendants' attack now shifts to the reliability of the taped conversation.[5] We will assume *arguendo* that the issue was raised in the district court and is properly before us.

### A.

We must determine at the outset the appropriate standard for reviewing the district court's admission of coconspirator statements under FRE 801(d)(2)(E) in the context of a challenge to their reliability. We find no cases in this circuit setting forth such a standard. However, in *In re Japanese Electronics*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), we considered the standard of review for determinations of reliability under FRE 803(8)(C) (the records of government proceedings exception to the hearsay rule). While the factors which go into making a substantive determination of the reliability of the proferred evidence are somewhat different under the two rules, the process of making the determination is the same. Under both rules, the district court must make a preliminary factual inquiry, determine what factors are important in assessing reliability, and weigh the factors. In *Japanese Electronics* we held:

> The scope of review of the trial court's trustworthiness determination depends

on the basis for the ruling. When the trial court makes Rule 104(a) findings of historical fact about the manner in which a report containing findings was compiled we review by the clearly erroneous standard of Fed.R.Civ.P. 52. But a determination of untrustworthiness, if predicated on factors properly extraneous to such a determination, would be an error of law.... There is no discretion to rely on improper factors. Such an error of law might, of course, in a given instance be harmless within the meaning of Fed.R.Civ.P. 61. In weighing factors which we consider proper, the trial court exercises discretion and we review for abuse of discretion. Giving undue weight to trustworthiness factors of slight relevance while disregarding factors more significant, for example, might be an abuse of discretion.

723 F.2d at 265–66. *See also id.* at 257.

In *United States v. Adams*, 759 F.2d 1099, 1105–06 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 275 & 336, 88 L.Ed.2d 236 (1986), we held that our review of whether, under our holding in *Inadi*, a coconspirator had properly been made available was plenary because resolution of the issue involved the interpretation and application of legal precepts. Reliability and unavailability are both requirements of the Confrontation Clause test set forth by *Ohio v. Roberts*, but we believe there is an element of discretion involved in weighing the various factors of reliability which is not present in the more straightforward determination of availability, justifying application of the more complicated *Japanese Electronics* standard.

### B.

The defendants claim that the taped conversation is unreliable and that its admission therefore violated the defendants' rights under the Sixth Amendment. They argue first that this case differs from *Ina-*

---

5. Because the defendants do not attack the reliability of the Botro statements, we will assume that they concede that there was no error in admitting them in light of the Supreme Court's

opinion in *Inadi*. In any case, we hold there was no indication of unreliability in the Botro statements.

*di* because neither of the defendants were parties to the taped conversation. The only party to the conversation to testify at the trial was the government informant, Carratura, who had an interest in producing convictions, and the district court admitted some of Carratura's statements which it held had been adopted by Picco and Fred Paone. The defendants argue that the Supreme Court's *Inadi* holding does not apply in such circumstances. Therefore, they argue, it was reversible error for the government not to produce Picco and/or Paone at trial or demonstrate their unavailability.

They further argue that it was necessary to make Picco and Paone available because the defendants could not explain or contradict the statements made on the tape. The defendants also reclothe some of their arguments about whether the taped conversation satisfied the elements of FRE 801(d)(2)(E), discussed *infra,* into Sixth Amendment arguments. Finally, the defendants attack the reliability of the tapes because they claim their contents are contradicted by other evidence some of which was introduced at trial and some of which defendants claim was discovered after trial.

■ The defendants' arguments betray a fundamental misunderstanding both of the Supreme Court's *Inadi* decision and the elements to be considered in a determination of reliability. *Inadi* held that there is no requirement that the government produce the declarants or demonstrate that they were unavailable when coconspirator statements are introduced under FRE 801(d)(2)(E). The Court's reasoning was not founded on the facts of *Inadi,* but on the nature of coconspirator evidence and the historical development of the rule allowing its admission.

Coconspirator statements differ from the types of out-of-court statements where *Roberts* requires a showing of unavailability in that they are not a substitute for live testimony but "provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court." *Inadi,* 106 S.Ct. at 1126. For this reason, the Court held that

"the unavailability rule, developed for cases involving former testimony, is not applicable to coconspirators' out-of-court statements." *Id.* Thus, any attempt to resurrect an availability requirement because the tapes in this case are less reliable than those in *Inadi* is foreclosed: there is no longer any such constitutional requirement in the FRE 801(d)(2)(E) context.

We derived the availability requirement in our holding in *Inadi* from *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *Roberts* concerned admissions of prior testimony, not coconspirator statements, and held that "[t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay." 448 U.S. at 65, 100 S.Ct. at 2538. The first, under the circumstances operative in that case, is an availability requirement, and the second is that the statements must bear sufficient "indicia of reliability." 448 U.S. at 65–66, 100 S.Ct. at 2538–39. We have often held that coconspirator statements "must bear sufficient 'indicia of reliability' to demonstrate their trustworthiness," *United States v. Ammar,* 714 F.2d 238, 253 (3d Cir.1983), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1982), although all circuits are not in agreement on this point. *See Inadi,* 106 S.Ct. at 1129, n. 1 (Marshall, J., dissenting). The issue of reliability was not presented to the Court in *Inadi,* and that decision has thus left our rule undisturbed. *See Inadi,* 106 S.Ct. 1124–25, n. 3, and 106 S.Ct. 1129 (Marshall, J., dissenting).

The reliability requirement is separate and distinct from an availability requirement. While a demonstration of unreliability cannot serve to bootstrap an availability requirement onto admissions of FRE 801(d)(2)(E) evidence, as defendants argue, the question of the reliability of coconspirator statements is of constitutional significance in its own right. *See Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). Indeed, it is through a determination of the reliability of coconspirator statements that we carry out "the mission of the Confrontation

Clause [i.e.,] to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S. at 89, 91 S.Ct. at 220, *quoting California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970).

Coconspirator statements do not possess the special trustworthiness characteristic of evidence falling within "a firmly rooted hearsay exception." *Ammar*, 714 F.2d at 255, *quoting Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. They are instead admitted because of "the legal fiction that each conspirator is an agent of the other and that statements of one can therefore be attributable to all." *Ammar*, 714 F.2d at 255–56. Thus, the Confrontation Clause requires a showing of reliability in addition to the requirements set forth in FRE 801(d)(2)(E).

■■■ While "in many, if not most, instances a coconspirator statement which is admissible under Rule 801(d)(2)(E) will also be sufficiently reliable to satisfy the Confrontation Clause,' *Ammar*, 714 F.2d at 256, many courts including ours have used the factors set forth in *Dutton v. Evans* as a benchmark for assessing reliability in the constitutional context, although " 'a statement may be admitted over confrontation clause objections even if it does not pass scrutiny under each prong of the *Dutton* test.' " *Ammar*, 714 F.2d at 256, *quoting United States v. Perez*, 658 F.2d 654, 661 (9th Cir.1981). The *Dutton* factors are 1) whether the declaration contained assertions of past fact; 2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; 3) whether it was possible that the declarant was relying upon faulty recollection; and 4) whether the circumstances under which the statements were made provided reason to believe that the declarants had misrepresented the defendant's involvement in the crime. *See Ammar*, 714 F.2d at 256, *citing Dutton v. Evans*, 400 U.S. at 88–89, 91 S.Ct. at 219.

■■■ Thus, the bulk of the defendants' arguments with regard to the reliability of the tapes are simply not relevant to a determination of reliability. Contentions that the substance of the coconspirator statements is contradicted by other evidence simply have no bearing on the reliability of the statements for Confrontation Clause purposes. The credibility of the statements in the face of other evidence is, of course, for the jury to assess. Similarly, the mere fact that statements were not made under the circumstances required by FRE 801(d)(2)(E) does not predetermine whether the statements are reliable in the Sixth Amendment context, because the Constitution permits the introduction of a broader range of coconspirator statements than does the federal rule, as *Dutton* itself makes clear. *See Dutton*, 400 U.S. at 82, 91 S.Ct. at 216.

Finally, the fact that the defendants were not participants in the taped conversations does not imped their admissibility so long as the statements are determined to be reliable.

> Declarations by one defendant may also be admissible against other defendants upon a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy. The same is true of declarations of coconspirators who are not defendants in the case on trial.

*United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974). Indeed, at least one of the tapes in *Inadi* recorded a conversation between unindicted coconspirators. *Inadi*, 748 F.2d at 815 (conversation between McKeon and Marianne Lazaro, both unindicted coconspirators).

At best, defendants' post-argument letter brief, which does not attempt to frame its arguments according to *Ammar* and *Dutton*, can be read to challenge the first, second, and fourth *Dutton* factors. There is no contention that any of the matters

discussed were inaccurately presented because of faulty recollection.

The first *Dutton* factor is whether the declaration contained assertions of past fact. The defendants objected to the entire taped conversation as a narrative of past events in the course of their arguments that the statements did not meet the "during the course and in furtherance of the conspiracy" requirements of FRE 801(d)(2)(E). The district court found that the statements had been made in furtherance of the continuing operation of the conspiracy and for purposes of reassuring the conspirators and maintaining trust and cohesiveness among them. We held in *Ammar* that "[s]uch statements are more than 'mere narratives' of past events." *Ammar*, 714 F.2d at 252.

While we confront this issue in a slightly different context, we find that *Ammar's* reasoning applies. The coconspirators in the conversation in question were trying to devise a way to conceal the scheme of criminal behavior that was still ongoing, and indeed continued for another two years or so. Any discussion of past events was an integral part of the business at hand, and is therefore not a mere narrative of past events. For purposes of the *Dutton* test, then, the mere fact that there was some discussion of past events does not render the statements unreliable.

The defendants argue that only Carratura's statements connect the participants in the conversation with the defendants. Taking this as a contention that there is no showing that coconspirators Picco and Fred Paone had personal knowledge of the defendants' participation in the conspiracy, we must reject it. The district judge found that Fred Paone's response "Right" to Carratura's reference to a meeting at a Newark restaurant between Carratura, Fred Paone, and James Paone was a factual assertion of the existence of the meeting unambiguously adopted by Fred Paone. As such, it was admissible against the indicted conspirators in the same way that any other coconspirator statement is admissible, i.e., when the requirements of FRE 801(d)(2)(E) are met.

We cannot say the district court's finding is erroneous. The meeting linked James Paone directly to the conspiracy and to these coconspirators. Pecora was linked to the scheme through other evidence at the trial. Here, the participants were thoroughly familiar with their end of the conspiracy. Thus, any contention that the second *Dutton* factor was not satisfied is without merit.

Finally, the defendants challenge the reliability of the tapes because Carratura had an interest in steering the conversation, since he was an informant and no longer a coconspirator at the time of the conversation. The district court agreed. The tape was carefully redacted before being played to the jury to remove all statements by Carratura except those that the court found were unambiguously adopted by Picco and/or Fred Paone. The district court thus avoided any potential prejudice caused by Carratura's status as a government informer. The defendants do not contend that Picco or Fred Paone had reason to manipulate the conversation. Indeed, it was in their interest to devise a scheme that could both conceal the existence of the ongoing conspiracy and the parts they had played in it. Since there was no divergence of interests between Picco and Fred Paone and the defendants, there is no reason to believe that the declarants misrepresented the true nature of the conspiracy. *Cf., Lee v. Illinois*, — U.S. —, —, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986) (reliability of codefendant's confessions suspect because of "strong motivation to implicate defendant and exonerate himself"). Thus, an examination of the fourth *Dutton* factor shows no reason to doubt the reliability of the tapes.

In light of the foregoing, we hold that the tapes bore sufficient indicia of reliability to satisfy the Confrontation Clause of the Sixth Amendment.

## V.

The defendants also challenge the admission of the tapes on the basis that the "in furtherance of the conspiracy" requirement of FRE 801(d)(2)(E) was not met. Because this question involves the application of legal precepts to the facts surrounding the conversation, our review is plenary.

■■■ Rule 801(d)(2)(E) allows admission of an out-of-court statement if "[t]he statement is offered against a party and is ... (E) a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy." Coconspirator statements may be admitted under the rule if they meet three conditions: "(1) there must be independent evidence establishing the existence of the conspiracy and connecting the declarant and defendant to it; (2) the statement must have been made in furtherance of the conspiracy; and (3) it must have been made during the course of the conspiracy." *Ammar*, 714 F.2d at 245.

The defendants contend that the government did not satisfy the second requirement because the purpose of the conversation was to conceal the declarants' participation in the conspiracy at a time when the declarants were no longer conspirators, having terminated their involvement. They claim that the conversation furthered an entirely separate conspiracy to obstruct justice, and was therefore not admissible. In support of these contentions, defendants rely on a line of cases that they interpret to hold that acts of covering up or concealing the existence of a conspiracy are never acts in furtherance of the conspiracy: *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); and *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), among others.

It distorts those cases, however, to read them for the broad proposition that no acts of concealment can be in furtherance of a conspiracy. All three cases hold that declarations evidencing an agreement to conceal a conspiracy made "after the conspiracy has ended," *Lutwak*, 344 U.S. at 618, 73 S.Ct. at 489, or "after [the] objectives [of the conspiracy charged in the indictment] either had failed or been achieved," *Krulewitch*, 336 U.S. at 442, 69 S.Ct. at 718 are not made in furtherance of the conspiracy.

If the acts of concealment amount to "nothing more than ... (1) a criminal conspiracy which is carried out in secrecy; (2) a continuation of the secrecy after the accomplishment of the crime; and (3) desperate attempts to cover up after the crime begins to come to light," *Grunewald*, 353 U.S. at 403, 77 S.Ct. at 973 then declarations made during an agreement to conceal are indeed not made in furtherance of the conspiracy. But *Grunewald* cautions that

> [b]y no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy.... [A] vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central purposes have been attained for the purpose only of covering up after the crime.

353 U.S. at 405, 77 S.Ct. at 974.

*Grunewald*, in other words, directs our attention to the function served by the act of concealment in relation to the objectives of the conspiracy. "The 'in furtherance' requirement is usually given a broad interpretation." *Gibbs*, 739 F.2d at 845. In this case, the concealment of the existence of the conspiracy served not only to cover up the declarants' past participation in criminal behavior, but to shield the ongoing conspiracy as well. We held in *United States v. Lowell*, 649 F.2d 950, 959 (3d Cir.1981), that a jury could find that a phone conversation evidencing an act of concealment was an act in furtherance of the conspiracy if the purposes or objectives of the conspiracy had not yet been achieved. *See also United States v. DePeri*, 778 F.2d 963, 982 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986) ("conversation between members of the conspiracy apprising one another of their efforts to avoid indictment and conviction ... were

made in furtherance of the conspiracy"). Here, where the concealment of the existence of the conspiracy enabled the defendants to continue their illegal payoff scheme for two more years, it was no error to hold that the statements were made in furtherance of the conspiracy.

▉ This holding is unaffected by defendants' argument that the declarants were no longer members of the conspiracy and therefore that the 801(d)(2)(E) in furtherance requirement was not met. The defendants' only support for their assertion is that the declarants were no longer active participants in the payoff scheme at the time of the conversation. We have often held that "[m]ere cessation of participation in the conspiracy is not enough." *Lowell*, 649 F.2d at 957. *See Gibbs*, 739 F.2d at 845 (citing cases). The government showed at trial by a preponderance of the evidence that the declarants had been part of the conspiracy prior to the conversation and that showing is not challenged here. There was certainly sufficient basis in the record for the district court to find that the declarants had not withdrawn from the conspiracy at the time of their statements.

### VI.

In addition to the issues discussed at length above, the defendants presented a number of other issues. First, we have examined defendants' contentions that the district court erred in denying their motions for a new trial on the basis: 1) that the verdict was against the weight of evidence; 2) of newly discovered evidence; 3) that the district court's instructions to the jury were confusing, prejudicial, unfair, and erroneous as a matter of law; and 4) that the district court erred in holding that the admission of evidence concerning defendant Pecora's brother and father, both high officials in Local 863, was harmless error. We find these contentions without merit and reject them without further discussion.

▉ Second, the defendants claim that the government impermissibly amended its theory of the case in mid-trial and that the district court amended the indictment by allowing the government to introduce evidence concerning defendant Pecora's father and brother. In reviewing the record, we find no amendment of or variance from the indictment, and we reject defendants' argument accordingly.

▉ The defendants also contend that the release during the course of the trial of the district court's opinion in *United States v. Local 560*, 581 F.Supp. 279 (D.N.J.1984), *aff'd*, 780 F.2d 267 (3d Cir.1985), resulted in substantial publicity which adversely affected their right to a fair trial. The *Local 560* case was an unrelated civil RICO case that coincidentally happened to involve labor racketeering charges against Teamster officials of a different local in northern New Jersey. Publicity concerning a wholly unrelated case does not come within the cases cited by the defendants, *e.g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1956); *Irwin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); and *United States ex rel. Doggett v. Yeager*, 472 F.2d 229 (3d Cir.1973). All those cases involve substantial adverse publicity concerning the defendants themselves and their connection to the crime for which they were being tried. There is no such showing here and we decline to extend those cases to the situation before us.

▉ The defendants contend that the district court's decision to allow the jury to use the transcript of the taped conversation as an aid in its deliberations prejudiced their right to a fair trial. We find nothing in the record to indicate that the jury relied improperly on the transcript or that the transcript contained inaccuracies that would substantially affect defendants' rights in the event the jury had relied upon it. *See United States v. Hans*, 738 F.2d 88 (3d Cir.1984).

█ Finally, defendants point to examples of alleged prosecutorial misconduct which they contend denied them a fair trial. The examples are: 1) two instances of alleged improper presentation of evidence concerning prior convictions of no-show employees; 2) the suggestion by the prosecutor in the presence of the jury that the jury might use the transcript of the tape as an aid in its deliberations; 3) alleged improper introduction of evidence concerning Thomas Pecora's father and brother; 4) failure to advise the defendants of the whereabouts of the informant, Carratura; and 5) alleged improper gestures and comments made by the United States Attorney during the course of the trial. We have examined the record and find that some of these instances did not constitute misconduct at all, or any other type of error, and that those that arguably might have been misconduct were minor and were adequately cured by cautionary instructions from the district court. We find that no " 'prejudice inure[d] to the defendant from the challenged improprieties.' " *Adams,* 759 F.2d at 1111, *quoting United States v. Somers,* 496 F.2d 723, 737 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974), and we accordingly reject defendants' argument.

### VII.

We have considered all arguments made by the defendants, and conclude that they lack merit. The judgments of the district court will be affirmed in all respects.